EXHIBIT C



600 B Street, Suite 1900
San Diego, CA 92101
619.525.3990 phone
619.525.3991 fax
www.robbinsarroyo.com

June 27, 2017

**VIA FEDEX GROUND**

Board of Directors
EXXON MOBIL CORPORATION
5959 Las Colinas Boulevard
Irving, TX 75039

Re:   **Exxon Mobil Corporation Stockholder Litigation Demand**

Dear Board of Directors:

We write on behalf of our client, Sarah von Colditz, a beneficial owner of Exxon Mobil Corporation ("Exxon" or the "Company") stock. Our client demands that Exxon's Board of Directors (the "Board") investigate, address, remedy, and commence appropriate legal action against current and former Exxon directors and officers, including Rex W. Tillerson ("Tillerson"), Michael J. Boskin ("Boskin"), Peter Brabeck-Letmathe ("Brabeck-Letmathe"), Ursula M. Burns ("Burns"), Larry R. Faulkner ("Faulkner"), Andrew P. Swiger ("Swiger"), Jeffrey J. Woodbury ("Woodbury"), David S. Rosenthal ("Rosenthal"), Darren W. Woods ("Woods"), William C. Weldon ("Weldon"), Steven S. Reinemund ("Reinemund"), Samuel J. Palmisano ("Palmisano"), Douglas R. Oberhelman ("Oberhelman"), Kenneth C. Frazier ("Frazier"), Henrietta H. Fore ("Fore"), Jay S. Fishman ("Fishman"), and other appropriate individuals for breach of fiduciary duties, violations of federal securities law, and other violations of law.

## Overview

Exxon is the world's largest oil company. Exxon has business segments referred to as "Upstream," "Downstream," and "Chemical." The Upstream segment is engaged in the exploration, production, transportation of crude oil and natural gas. The Downstream segment manufactures and sells petroleum products. The Chemical segment manufactures and sells petrochemicals. Exxon is truly a global organization with exploration and development activities in North America, South America, Europe, Africa, Asia, and Australia.

Exxon has historically been one of the world's largest purveyors of climate change skepticism. The Company has spent massive sums of money funding think tanks and advocacy groups that publish scholarly papers questioning the existence and effects of climate change. In furtherance of this cause, Exxon has produced full-page anti-climate change editorials, styled as advertisements, in publications such as *The New York Times*, *The Washington Post*, and *The Wall Street Journal*.

Notwithstanding this advocacy, Exxon began examining climate change decades ago. According to reports from late 2015, Exxon was conducting extensive research regarding the



effects of fossil fuel usage on the environment. Because of these efforts, Exxon, it's Board, and executives knew the negative effects of climate change and global warning and their relation to the worldwide use of hydrocarbons. Nevertheless, as detailed below, Exxon has made numerous materially false and misleading statements and omissions regarding the risk climate changed posed for the petroleum industry. More specifically, Exxon knew that it was highly likely that it would not be able to extract all of its hydrocarbon reserves and that certain of those assets were "stranded" and would have to be written down. In addition to failing to recognize the impact of climate change on the value of its reserves, Exxon similarly failed to properly account for the declining price of oil and its impact on the value of its reserves. Exxon had also employed an inaccurate "price of carbon"—the cost of regulations such as a carbon tax or cap-and-trade system to push down emissions—in evaluating the value of its future oil and gas prospects in order to keep the value of its reserves materially overstated. As a result of Exxon's vast misrepresentations, the price of Exxon stock was artificially inflated. Then, through a series of disclosures from various sources in 2016, the market learned that regulators were actively reviewing Exxon's accounting treatment of its petroleum reserves. These revelations drove inquiries by multiple state attorney generals and have prompted multiple lawsuits related to Exxon's misrepresentations.

### Exxon's Climate Change Research

Despite its reputation as a climate change cynic, Exxon had in fact been doing decades of research regarding the impact that burning fossil fuels was having on the environment. Exxon conducted a scientific research program that documented the potential effects of climate change, the likely contribution of fossil fuels to climate change, and the risks of climate change. In addition the Company had its own computer models and built up a team of in-house experts to study these matters. Naturally, Exxon's research also included assessing the impact of climate change on the Company's assets and businesses. Exxon scientists understood that a greater than two degree Celsius warming in global temperatures would pose a significant threat to the environment, and that in order to prevent the temperature increase from happening, the worldwide use of fossil fuels would have to be greatly reduced. As a result of this work, Exxon, the Board, and its executives knew the risks climate change posed for the future use of fossil fuels, and, more specifically, the risk of climate change to Exxon's petroleum reserves.

### Exxon's Materially False and Misleading Statements

On February 19, 2016, Exxon issued a release entitled "ExxonMobil Announces 2015 Reserves Additions." This release stated that Exxon had "added 1 billion oil-equivalent barrels of proved oil and gas reserves in 2015, replacing 67 percent of production, including a 219 percent replacement ratio for crude oil and other liquids," such that "[a]t year-end 2015, ExxonMobil's proved reserves totaled 24.8 billion oil-equivalent barrels." The release quoted Tillerson as stating that "ExxonMobil has a successful track record of proved reserves replacement over the long term, demonstrating the strength of our global strategy to identify, evaluate, capture and advance high-quality opportunities," and that the Company's "proved reserves represent a diverse portfolio that positions [it] to create shareholder value as [it] supplies long-term energy demand growth." The release further quoted Tillerson as emphasizing that

Exxon would "continue to apply [its] disciplined, paced investing approach as [it] develops [its] industry-leading resource base."

On February 24, 2016, Exxon filed with the U.S. Securities and Exchange Commission ("SEC") its Annual Report on Form 10-K for the year ended December 31, 2015, which was signed by Tillerson, Boskin, Brabeck-Lethmathe, Burns, Faulkner, Swiger, Rosenthal, Woods, Weldon, Reinemund, Palmisano, Oberhelman, Frazier, Fore and Fishman (the "2015 Form 10-K"). Concerning Exxon's "Disclosure of Reserves," and specifically its "Summary of Oil and Gas Reserves at Year-End 2015," the 2015 Form 10-K stated:

> Gas is converted to an oil-equivalent basis at six million cubic feet per one thousand barrels. The Corporation has reported proved reserves on the basis of the average of the first-day-of-the-month price for each month during the last 12-month period. When crude oil and natural gas prices are in the range seen in early 2016 for an extended period of time, under the Securities and Exchange Commission's (SEC) definition of proved reserves, certain quantities of oil and natural gas *could temporarily not qualify as proved reserves.* Under the terms of certain contractual arrangements or government royalty regimes, lower prices can also increase proved reserves attributable to ExxonMobil. *Otherwise, no major discovery or other favorable or adverse event has occurred since December 31, 2015, that would cause a significant change in the estimated proved reserves as of that date.*

The 2015 Form 10-K praised the Company's precision and accuracy in calculating its reserves:

> *The estimation of proved reserves, which is based on the requirement of reasonable certainty, is an ongoing process based on rigorous technical evaluations, commercial and market assessments and detailed analysis of well and reservoir information such as flow rates and reservoir pressure declines.* Furthermore, the Corporation only records proved reserves for projects which have received significant funding commitments by management made toward the development of the reserves. Although the Corporation is reasonably certain that proved reserves will be produced, the timing and amount recovered can be affected by a number of factors including completion of development projects, reservoir performance, regulatory approvals and significant changes in projections of long term oil and natural gas price levels. In addition, proved reserves could be affected by an extended period of low prices which could reduce the level of the Corporation's capital spending and also impact our partners' capacity to fund their share of joint projects.

> When crude oil and natural gas prices are in the range seen in late 2015 and early 2016 for an extended period of time, under the SEC definition of proved reserves, certain quantities of oil and natural gas, such as oil sands operations in Canada and natural gas operations in North America could temporarily not qualify as

proved reserves. Amounts that could be required to be de-booked as proved reserves on an SEC basis are subject to being re-booked as proved reserves at some point in the future when price levels recover, costs decline, or operating efficiencies occur. Under the terms of certain contractual arrangements or government royalty regimes, lower prices can also increase proved reserves attributable to ExxonMobil. *We do not expect any temporary changes in reported proved reserves under SEC definitions to affect the operation of the underlying projects or to alter our outlook for future production volumes.*

On March 2, 2016, Exxon filed a final prospectus with the SEC and conducted a $12 billion public debt offering. The registration statement and prospectus used to complete the $12 billion offering incorporated by reference Exxon's 2015 Form 10-K. The registration statement used for this offering was signed by Tillerson, Boskin, Brabeck-Letmathe, Burns, Faulkner, Fishman, Fore, Frazier, Palmisano, Reinemund, Weldon, and Swiger.

Also on March 2, 2016, Exxon conducted its 2016 analyst meeting at the New York Stock Exchange building in New York City. Tillerson made remarks that "the business environment ha[d] changed dramatically, even since ... last year, with a sharp decrease in crude oil and natural gas prices," but due to its "operational integrity" and "reliability," Exxon was *"uniquely suited to endure these conditions and outperform competition, leaving [Exxon] best-positioned to capture value in the upturn."* Addressing the quality of the Company's reserves, Tillerson represented that regardless of the impairment charges Exxon's competitors were taking on their oil reserves, the value of Exxon's reserves were not impaired because of the Company's "disciplined investment approach, effective project management and innovative technologies." Tillerson stated:

> Sustained leadership and capital efficiency reflects our commitment to a disciplined investment approach, effective project management and innovative technologies to grow a well-balanced portfolio. Our efficient asset base, enhanced by new investments, positions the Corporation for long-term performance across a broad range of conditions.
>
> *The quality of ExxonMobil's portfolio is also evident relative to significant recent asset impairments by our competitor group.* ... the North American pure play E&P companies, which, if you look at the last couple of years, took impairments of over $120 billion, and, if you look at the last eight years, took impairments of over $200 billion.
>
> Now, while these impairments will improve competitor return on capital employed performance in the future years, *they represent a significant destruction of shareholder assets. Our investment discipline delivers industry-leading returns and a portfolio that is durable across a wide range of commodity prices. Effective project execution provides the lowest installed capital costs, which, along with optimized operations, creates a long-term value that simply outpaces our competitors.*

> *...ExxonMobil's structural advantage in capital employed per barrel of crude reserves, which leads competition at $6.50 a barrel. Our high-quality, efficient capital base is an outcome of our investment approach, consistently applied for decades. Importantly, 73% of our proved reserves are developed and in production, contributing to the bottom line.*
>
> Next, I will discuss reserves replacement, which is an outcome of our disciplined investment approach. *ExxonMobil has a successful track record of long-term proved reserves additions, demonstrating the strength of our global strategy to identify, evaluate, capture, and advance high-quality opportunities.* The Corporation has a diverse resource base of 91 billion oil-equivalent barrels, all in various stages of evaluation, design and development. As you can see in the graphic, we consistently convert sizable portions of the resource base along with newly acquired resources into proved reserves, which currently total 25 billion oil equivalent barrels.
>
> We have consistently added about 1.5 billion to 2 billion oil equivalent barrels of resource to prove reserves each year, replacing over 100% of production for over two decades. We have a long reserve life of 16 years at current production rates, which does lead competition. Last year, we replaced 67% of production, adding 1 billion oil-equivalent barrels of proved reserves in both oil and gas, but that reflects also a 219% replacement of crude oil and other liquids.
>
> *The level of reserve replacement in any given year is an outcome of our investment choices, and it is not an objective. We are value-focused, making the best long-term decisions for our shareholders, progressing opportunities at the right time and deploying capital efficiently to create that long-term shareholder value, even if it means interrupting a 21-year trend.*
>
> *The quality of our resource opportunities remains strong into the future. They have not diminished in the current business climate. ExxonMobil maintains a rigorous reserves evaluation process. And, as with all aspects of our business, we approach the reporting of reserves balances with the highest integrity.*

Referencing Exxon's "Operations Integrity," and its approach to climate change, Tillerson extolled the Company's efforts to lower emissions and actually claimed the Company knew so much about climate change that the Company had long been educating others on the subject:

> Now let's take a look at our approach to environmental protection. We recognize that meeting the world's growing energy needs while protecting the environment is one of today's grand challenges. We are committed to lowering emissions, reducing spills, and minimizing waste to mitigate the environmental impact of our operations. We have developed and deployed advanced technologies and enhanced products that have lowered greenhouse gas emissions across the value chain.

Sustainable improvements in our operations have reduced cumulative greenhouse gases by more than 20 million metric tons over the past decade. For example, we have increased our energy efficiency significantly over time by installing additional cogeneration facilities in our operations, making us an industry leader with current gross capacity of 5.5 gigawatts. And products we produce, like cleaner-burning natural gas, also help to reduce global emissions.

*At ExxonMobil, we do take the risk of climate change seriously. We have studied climate change for almost 40 years, and we consistently collaborate and share our research with leading scientific institutions, top universities, the United Nations, and other public stakeholders. We also engage in constructive dialogue on climate change policy options with NGOs, industry and policymakers.*

On March 30, 2016, Exxon published its 2015 Corporate Citizenship Report, which claimed to describe Exxon's efforts to lower climate change risks. In the report, Exxon represented that because the transition to lower emissions sources would take "many decades," none of Exxon's proven hydrocarbon reserves were or would become "stranded." This report stated:

By 2040, the world's population is projected to reach 9 billion – up from about 7.2 billion today – and global GDP will have more than doubled. As a result, we see global energy demand rising by about 25 percent from 2014 to 2040. In order to meet this demand, we believe all economic energy sources, including our existing hydrocarbon reserves, will be needed. *We also believe that the transition of the global energy system to lower-emissions sources will take many decades due to its enormous scale, capital intensity and complexity. As such, we believe that none of our proven hydrocarbon reserves are, or will become, stranded.*

ExxonMobil's long-range annual forecast, The Outlook for Energy, examines energy supply and demand trends for approximately 100 countries, 15 demand sectors and 20 different energy types. The Outlook forms the foundation for the company's business strategies and helps guide our investment decisions. In response to projected increases in global fuel and electricity demand, our 2016 Outlook estimates that *global energy-related $CO_2$ emissions will peak around 2030 and then begin to decline.* A host of trends contribute to this downturn – including slowing population growth, maturing economies and a shift to cleaner fuels like natural gas and renewables -- some voluntary and some the result of policy.

*ExxonMobil addresses the potential for future climate change policy, including the potential for restrictions on emissions, by estimating a proxy cost of carbon. This cost, which in some geographies may approach $80 per ton by 2040, has been included in our Outlook for several years.* This approach seeks to reflect potential policies governments may employ related to the exploration,

development, production, transportation or use of carbon-based fuels. We believe our view on the potential for future policy action is realistic and by no means represents a "business-as-usual" case. We require all of our business lines to include, where appropriate, an estimate of greenhouse gas-related emissions costs in their economics when seeking funding for capital investments.

*We evaluate potential investments and projects using a wide range of economic conditions and commodity prices. We apply prudent and substantial margins in our planning assumptions to help ensure competitive returns over a wide range of market conditions. We also financially stress test our investment opportunities, which provides an added margin against uncertainties, such as those related to technology development, costs, geopolitics, availability of required materials, services and labor. Stress testing further enables us to consider a wide range of market environments in our planning and investment process.*

On April 29, 2016, Exxon issued a news release announcing its financial results for the first quarter ended March 31, 2016. Exxon's Quarterly Report on Form 10-Q for this period was signed by Rosenthal. For this period, Exxon reported profits of $1.8 billion. Tillerson commented on the results, stating in pertinent part that "[t]he organization continue[d] to respond effectively to challenging industry conditions, capturing enhancements to operational performance and creating margin uplift despite low prices," and that "[t]he scale and integrated nature of [Exxon's] cash flow provide[d] competitive advantage and support[ed] consistent strategy execution." Following the issuance of the earnings release, Exxon held a conference call with investors and analysts to discuss the Company's earnings and operations. During the conference call, Woodbury noted that "Standard & Poor's reduced its credit rating on ExxonMobil by one notch to AA+ with a stable outlook," and that "[e]arlier th[at] month Moody's [had] reaffirmed its AAA credit rating on the Corporation with a negative outlook." Woodbury also downplayed the credit rating reduction in the following discussion with a stock analyst during the Q&A portion of the call:

> [Analyst]: *I was looking back at the interview that Rex Tillerson gave after the analyst meeting when he was asked about the triple A rating, and what he said quite specifically is that there's been periods where Exxon's financial metrics have been worse than they are today, but you still retained a triple A rating, and obviously as you mentioned in your remarks, you have been downgraded by S&P.*
>
> Naturally I went to S&P and what I saw there was the comment that maintaining production and replacing reserves will require higher spending from Exxon. So it seems that given the financial metrics are not the issue, that it seems there's an upstream issue that S&P is concerned about.

*Exxon Mobil Corporation Stockholder Litigation Demand*
June 27, 2017
Page 8

Can you talk about your ability to maintain production and reserves at the current level of spending and address whether or not they're correct in thinking that you are going to have to spend a lot more to maintain reserves in production? Thanks.

[Woodbury]: ...Well, first, *I'll remind everybody that we've got a very large inventory of investment opportunities, over 90 billion barrels of resource in our portfolio, and if you recall in the analyst presentation, we provide a little bit more insi[ght] as to the type of projects and their potential capacity they can bring on over the time horizon.* And of course what we need to do is we need to make sure that as we mature that inventory of projects that we are doing it with the greatest value proposition, and I think we've made a great strive in finding opportunities in order to reduce the cost structure going forward.

*I'd say, though, ... that we've been through these cycles for a long time. We've have been able to maintain a very strong balance sheet. We've maintained our financial flexibility through the ups and downs, and, our inventory looks very attractive going forward. So we think all the elements are set right to continue to invest into an attractive way to maintain our lead on industry return on capital employed.*

The other point I'd remind you is as we showed in the analyst presentation we have done very well in terms of efficiency deploying investment dollars. If you'll recall, the upstream capital efficiency chart that we used in an analyst presentation showing our capital employed over proved reserves clearly we're distinguishing ourselves relative to others.

[Analyst]: Okay, Jeff, because of time constraints, I'll jump into another one. You again, mentioned return on capital employed. I really struggle with you losing money in the upstream on an earnings basis, particularly in the U.S., and how you reconcile that with the measure of the return of capital employed. Typically we don't look at that, we look at the cash flow measure. Can you help us with the DD&A upstream particularly in the U.S. so we can get to the cash returns that you're making as opposed to these losses upstream?

[Woodbury]: *We've got a very strong portfolio in the upstream, and remember that we invest with a long-term view that's informed by our long-term energy demand outlook. All of our assets were managed to maximize returns through the life cycle with the objective of maintaining positive cash flow in low price environments.* We'll continue to focus on those things that we control, cost, reliability, operational integrity.

Importantly, we'll invest in attractive opportunities throughout the cycle that further enhance the asset profitability, and we *see significant value in our assets, so, yes, there is a low price. We're in a low price period like we've been in the*

> *past. As I've said, we've really designed these assets to be very durable during a low price environment.*
>
> *They continue to generate – our producing assets continue to generate cash flow, and over the long-term we will continue to demonstrate, industry leading returns on capital employed.*

On July 29, 2016, Exxon issued a news release announcing its financial results for the second quarter ended June 30, 2016. Exxon's Quarterly Report on Form 10-Q for this period was signed by Rosenthal. Exxon reported profits of $1.7 billion. Chief Executive Officer Tillerson commented on the results stating "While [the Company's] financial results reflect[ed] a volatile industry environment, ExxonMobil remain[ed] focused on business fundamentals, cost discipline and advancing selective new investments across the value chain to extend [its] competitive advantage," and that the "corporation benefit[ed] from scale and integration, which provide the financial flexibility to invest in attractive opportunities and grow long-term shareholder value."

Back in 2014, oil prices began a decline that has persisted since that time. Under prevailing SEC reporting rules, the test for "proved" reserves is that the oil and gas must be "economically producible" based on a backward-looking twelve-month average price. Despite the steep and persistent decline in the price of oil, Exxon failed to write down any of its proved oil reserves. In fact, on October 30, 2015, Exxon issued a news release announcing its financial results for the third quarter of 2015 reflecting that the oil price decline of now more than a year and a half somehow had no impact on the value of Exxon's proved reserves. The news release stated:

> "We maintain a relentless focus on business fundamentals, including cost management, regardless of commodity prices," said Rex W. Tillerson, chairman and chief executive officer. "Quarterly results reflect the continued strength of our Downstream and Chemical businesses and underscore the benefits of our integrated business model."
>
> Downstream segment earnings nearly doubled from the third quarter of 2014 due to stronger refining margins. Chemical results, comparable with the year-ago quarter, reflect continued strength in product margins and the quality of the company's product and asset mix.
>
> Upstream production volumes increased 2.3 percent, or 87,000 barrels per day, to 3.9 million oil-equivalent barrels per day. Liquids volumes of 2.3 million barrels per day rose 13 percent driven by new developments in Canada, Indonesia, the United States, Angola and Nigeria.

Thus, Exxon continued to stress the quality and value of its proved reserves despite the depressed state of oil prices. Exxon's Quarterly Report on Form 10-Q for this period was signed by Rosenthal.

## Misrepresentations of Exxon's Proxy Cost of Carbon Analysis

Companies with investments in fossil fuels, like Exxon, often anticipate a price on carbon as they evaluate the financial viability of long-term projects. This occurs even if a company operates in regions that are not governed by an explicit carbon pricing instrument, such as a carbon tax. Many companies assume that a price of carbon exists to help guide the long-term capital investment decisions involving fossil fuels. By evaluating such decisions through the lens of a carbon price, companies can avoid stranded assets that they would have to retire before the end of their useful lives and mark as a loss on their balance sheets. This practice — assuming a price of carbon, even if one does not universally exist — is generally referred to as proxy carbon pricing. Exxon utilizes proxy carbon pricing designed to "reflect all types of actions and policies that governments may take" over a period of time in order to evaluate petroleum reserves and long term projects. As detailed below, Exxon has made many misrepresentations regarding its proxy cost of carbon analysis.

Prior to 2014, stockholders of several major fossil-fuel energy companies doing business in New York began proposing stockholder resolutions calling for increased disclosures concerning potential risks to the companies' value posed by the risk of future climate-change-related regulations. In March 2014, Exxon negotiated the withdrawal of one such resolution proposed by a group of its stockholders in exchange for the Company's agreement to publish a report concerning such risks. The report, "Energy and Carbon–Managing the Risks" (the "Report"), was published later that month. According to its opening paragraph, the Report "seeks to address important questions raised recently by several stakeholder organizations on the topics of global energy demand and supply, climate change policy, and carbon asset risk." In the Report, Exxon represented that it "does not believe current investment in new reserves are exposed to the risk of stranded assets" and that it is "confident that none of our hydrocarbon reserves are now or will become 'stranded.'" The Report specifies how Exxon purports to manage risk relating to prospective climate-change-related regulation:

> We also address the potential for future climate-related controls, including the potential for restriction on emissions, through the use of a proxy cost of carbon. This proxy cost of carbon is embedded in our current *Outlook for Energy*, and has been a feature of the report for several years. The proxy cost seeks to reflect all types of actions and policies that governments may take over the Outlook period relating to the exploration, development, production, transportation or use of carbon-based fuels. Our proxy cost, which in some areas may approach $80/ton over the Outlook period, is not a suggestion that governments should apply specific taxes.... Perhaps most importantly, we require that all our business segments include, where appropriate, [greenhouse gas] costs in their economics when seeking funding for capital investments. We require that investment proposals reflect the climate-related policy decisions we anticipate governments making during the Outlook period and therefore incorporate them as a factor in our specific investment decisions.

The Report's proxy cost representations followed years of similar representations by Exxon. In its annual "Outlook for Energy" reports starting in 2008, Exxon stated that it anticipated that governments would impose a cost of greenhouse gas ("GHG") emissions. Over time, these representations grew more specific. By the 2010 Outlook for Energy report, Exxon set out specific GHG prices, on specific timelines, that it expected as a result of regulatory action. These representations grew even more detailed in the 2012 Outlook for Energy, in which Exxon represented that these expectations were "integral to [its] forecasts" for hydrocarbon demand.

After the Report was published in March 2014, and continuing to the present, Exxon has represented that the core risk-management statements in the Report concerning the application of a proxy cost of GHGs to investment decisions apply to Exxon's business practices over the past decade, reflecting Company policy going back to 2007. In reports, speeches, and on its website, Exxon has frequently repeated the representations made in the Report and referred investors back to representations made in the Report:

- In November 2014, Exxon published an article on its Perspectives website, in which it stated that "ExxonMobil's Outlook for Energy" assumes a proxy cost of carbon of $80 per ton.

- In a December 2, 2015 article on the Perspectives website, Exxon stated that "ExxonMobil has included a proxy price on carbon in our business planning since 2007."

- In a 2016 report entitled "Meeting Global Needs – Managing Climate Change Business Risks," Exxon stated that "in most OECD nations, we assume an implied cost of carbon dioxide emissions that will reach about $80 per metric ton in 2040." Exxon's proxy notices to stockholders contained similar representations.

- In Exxon's April 13, 2016 notice of the Company's 2016 annual stockholder meeting, Exxon repeated the representations in the Report and also represented that the "proxy cost of carbon is embedded in our *Outlook for Energy*, and has been a feature of the report since 2007."

- On May 25, 2016, Tillerson told attendees at Exxon's annual stockholder meeting that the Company's "price of carbon gets put into all of our economic models when we make investment decisions as well. It's a proxy.... So we choose to put it in as a cost. So we have accommodated that uncertainty in the future, and everything gets tested against it."

- In Exxon's April 13, 2017 notice of the Company's 2017 annual stockholder meeting, Exxon recommended that stockholders vote against two proposals relating to the integration of climate-regulatory risk, referring stockholders to the

Report for a description of "how the Company integrates consideration of climate change risks into planning processes and investment evaluation."

Exxon has repeated its proxy cost representations in multiple Forms 10-K, multiple submissions to the Carbon Disclosure Project, its annual Outlook for Energy reports, and a separate report it issued in March 2017, entitled "2016 Energy and Carbon Summary."

Despite these representations, investigations revealed that the proxy cost Exxon set out in its internal policies was lower than the proxy cost the Company publicly represented that it used in investment decisions. Hence, Exxon represented to investors and the public that it was incorporating higher costs of GHG regulation into its business decisions than documents indicate that it actually was using, thereby potentially misleading investors and the public about the extent to which it was protecting its business from regulatory risks related to climate change. In particular, Exxon publicly stated in the Report and its Outlook for Energy reports, it applied proxy costs that reached $60/ton of GHGs by 2030, and $80/ton by 2040. In fact, the proxy cost figures used for Exxon's internal planning and budgeting reached only $40/ton by 2030.

This discrepancy was known at Exxon's highest levels. For example, an e-mail from Exxon's Corporate Greenhouse Gas Manager acknowledged as early as 2010 that the publicly disclosed proxy cost figures were "more realistic" than those that Exxon actually used. In another example, a 2011 e-mail states that Tillerson was "happy with the difference" because using a lower proxy cost was "conservative" from the perspective of investing in projects, like carbon capture and storage, that allow Exxon to claim emissions reduction credits. The e-mail acknowledged, however, that using a lower cost than publicly disclosed was "not conservative ... from the perspective of debiting actions that increase emissions," such as investing in oil and gas development projects. It was not until June 2014 that Exxon sought to eliminate this glaring inconsistency between external and internal figures. At that time, Exxon's new Corporate Greenhouse Gas Manager acknowledged in an internal presentation that the proxy costs that Exxon used internally were "non-conservative" with respect to projects that increase carbon emissions, and admitted that, in public reports, "we have implied that we use the [publicly-disclosed] basis for proxy cost of carbon when evaluating investments. Exxon did not inform investors about the undisclosed variation in its use of proxy-cost formulas when it represented in 2016 that it had been applying its publicly-touted proxy-cost analysis since 2007.

Compounding the discrepancy between Exxon's public representations and its internal policies, investigations have revealed that, apparently, Exxon has not applied a proxy cost of GHG at all with respect to many of its oil and gas projects. Evidence unearthed to date indicates that, by 2015, the Company faced a problem with respect to its multi-decade, multi-billion-dollar oil sands projects in Alberta, Canada. These projects, which have a significant impact on the Company's bottom line, apparently have not been as profitable as Exxon expected.

As noted above, in mid-2014, Exxon increased the proxy cost of GHGs in its internal analyses to match those that it had been touting to the public for years. This change would have affected the projected profitability of all of Exxon's projects. The Company's response was not to apply the proxy-cost analysis and recognize losses as appropriate. Rather, evidence indicates

that Exxon decided in the fall of 2015 to abandon the proxy-cost figures applicable to the Alberta projects that were set out in its internal policies, and decided instead to apply the current, much lower GHG tax that existed under Alberta law at that time. The proxy cost analysis set out in Exxon's internal policies required the incorporation of an escalating GHG cost, reaching $80/ton of carbon dioxide (or CO2 equivalent in other GHGs) by 2040, into the Company's economic forecasting for purposes of corporate decision-making. Instead of applying this analysis, Exxon applied the Alberta GHG tax, which did not exceed $24/ton (U.S. currency), and held that figure flat indefinitely into the future. Further, Exxon applied this cost of carbon to only a small percentage of emissions – 15% to 20% – specified under existing Alberta law, resulting in an effective cost of less than $4/ton.

Applying a GHG tax that already exists is not a "proxy" for anything, and does not "address the potential for future climate-related controls," as Exxon repeatedly represented that its proxy cost of GHGs was intended to do. The apparent inconsistency between Exxon's words and actions is particularly significant where, as here, the actual GHG costs Exxon applied were both significantly lower than its purported proxy costs, and applied only to a very limited percentage of its GHGs. The evidence suggests that at least one individual, Jason Iwanika, a Development Planner at an Exxon owned subsidiary in Canada sought direction from Exxon concerning how to apply the GHG assumptions set out in the Corporate Plan Dataguide to the Canadian oil sands projects, and questioned Exxon's directions that he deviate from those assumptions. According to Mr. Iwanika, another planner referred to the 2014 alignment of external and internal proxy cost figures as a "huge change." Nonetheless, it appears Exxon ignored his concerns and instructed him to disregard the proxy-cost assumptions set out in its internal policies.

The above statements were materially false and misleading at the time they were made because they failed to disclose and misrepresented, or recklessly disregarded, several adverse facts which were known to Exxon:

1) Exxon's internal documents concerning climate change recognized the environmental risks caused by global warming and climate change;

2) Given the risks associated with global warming and climate change, the Company would not be able to extract the existing hydrocarbon reserves Exxon reported in its financial statements for the first and second quarters of 2016 and, therefore, a material portion of those reserves were stranded and should have been written down; and

3) Exxon had employed an inaccurate "price of carbon" — the cost of regulations such as a carbon tax or a cap-and-trade system to push down emissions — in evaluating the value of certain of its future oil and gas prospects in order to keep the value of its reserves materially overstated.

### The Truth Is Exposed

Through a series of partial disclosures issued by different sources between mid-August 2016 and late September 2016, the market learned that federal regulators were actively scrutinizing Exxon's reserve accounting related to climate change and global warming and the Company's refusal to write down any of its oil and gas reserves in the face of declining global oil prices. On August 19, 2016, *The New York Times* published a report detailing an extensive interview during which New York Attorney General Eric T. Schneiderman ("Schneiderman") during which he explained that his investigation and the investigations by the other state attorneys general were not focused just on what Exxon had done in the past, but on the fact that Exxon was currently potentially defrauding its investors by overstating the value of its reserves on its books. *The New York Times* quoted him as pointing out that Exxon had expressly represented in 2014 "that global efforts to address climate change would not mean that it had to leave enormous amounts of oil reserves in the ground as so-called 'stranded assets.'" Scheiderman further stated that if Exxon's own internal research showed Exxon knew better ***"there may be massive securities fraud here."***

On September 16, 2016, before the open of trading, *The Wall Street Journal* published an exposé further confirming that Schneiderman was investigating Exxon for potentially defrauding investors. Noting that Exxon had "for years ... kept the value of its huge oil and gas reserves steady in the face of slumping energy prices while rivals since 2014 have slashed $200 billion off their combined holdings," *The Wall Street Journal* emphasized that Schneiderman was "examining accounting practices at the nation's largest energy company," citing "people familiar with the matter." According to *The Wall Street Journal*, Schneiderman's office was "adding scrutiny of [Exxon's] reserve values to its probe into Exxon's past knowledge of the impact of climate change and how it could affect its future business." At this time, Exxon's stock price remained artificially inflated while the Company continued to hide the full extent of the negative impact that it expected global warming to have on the value of its reserves.

Later that same day, *The Wall Street Journal* ran a third article entitled "When Should a Company Write Down Assets – It's an issue that's particularly demanding for energy companies, and the answer can make a big difference to investors." In this piece, *The Wall Street Journal* interviewed a retired reservoir engineer specializing in reserves accounting who spent most of his career as an executive at Exxon subsidiary Imperial Oil," disclosing that Exxon was "particularly reluctant to write down an asset because that removes its value permanently," and quoting the engineer as stating: "Impairment is a one-way trap door. Once they're gone, they're gone." With Exxon continuing to deny the need to take an impairment charge, however, the price of Exxon common stock declined only moderately when trading resumed on Monday, September 19, 2016, and the stock price remained artificially high.

On September 20, 2016, *The Wall Street Journal* reported that the SEC had been investigating Exxon's reserve accounting related to climate change and its failure to write down any of its oil and gas reserves in the face of the decline in global oil prices. According to the report, the "SEC sought information and documents in August from Exxon and the company's auditor, [PricewaterhouseCoopers]," again citing undisclosed "people familiar with the matter."

Those undisclosed people also reportedly told *The Wall Street Journal* that the SEC had "been receiving documents the company submitted as part of a continuing probe into similar issues begun last year by" Schneiderman. *The Wall Street Journal* also reported that the "SEC probe [was]n't believed to involve other energy companies," again citing an undisclosed "person familiar with the matter."

*The Wall Street Journal* quoted its undisclosed sources as stating that "[a] potential sticking point in the probe is what price Exxon uses to assess the 'price of carbon' – the cost of regulations such as a carbon tax or a cap-and-trade system to push down emissions – when evaluating certain future oil and gas prospects," adding that the "SEC [was] asking how Exxon's carbon price affects its balance sheet and the outlook for its future." According to *The Wall Street Journal*, "[w]hen such a theoretical price for carbon is low; more oil and gas wells would be commercially viable. Conversely, a high carbon price would make more of Exxon's assets look uneconomic to pull out of the ground in future years."

After the truth about Exxon's reserves had emerged and before the markets opened on October 28, 2016, Exxon issued a news release announcing its financial results for the third quarter ended September 30, 2016. In this release, the Company acknowledged that it might have to write down 3.6 billion barrels of oil sand reserves and one billion barrels of other North American reserves that Exxon now conceded were not profitable to produce under current prices. *The New York Times* stated later that day, while Exxon "has long insisted that it has been adequately accounting for the value of its oil and gas reserves – even as many other petroleum companies have taken big write-offs to reflect a two-year price slump," the potential write-down the Company now "face[s] could be the biggest accounting revision of reserves in its history." *The Wall Street Journal* noted Exxon "warned that it may be forced to eliminate almost 20% of its future oil and gas prospects, yielding to the sharp decline in global energy prices," even though up until then "Exxon [had been] alone among major oil companies in not having written down the value of its future wells as prices fell." In response to this news, the price of Exxon common stock fell significantly on unusually high trading volume of more than 19 million shares traded, more than twice the average volume over the preceding ten trading days.

### Damages to Exxon

As a result of Exxon's statements, the price of Exxon common stock was artificially inflated, reaching a more than $95 per share in July 2016. During the time of these disclosures, the price of Exxon stock plummeted to a close of $82.54 per share, thus erasing billions of dollars of market capitalization. Exxon's material misstatements and omissions not only artificially inflated the price of Exxon's publicly traded securities, but also influenced the rating agencies to issue strong ratings on Exxon's $20 billion of outstanding debt. In early March 2016, Exxon took advantage of its AAA rating, completing a massive $12 billion public debt offering. This was Exxon's largest debt offering ever. Exxon sought capital it would need to keep it afloat when the Company was ultimately forced to write down the billions of dollars of inflated reserve values carried on its books. At approximately the same point in time, the Company canceled its previously announced multi-billion dollar stock repurchase program.

*Exxon Mobil Corporation Stockholder Litigation Demand*
June 27, 2017
Page 16

Exxon has suffered other consequences as a result of these misrepresentations. As noted, Schneiderman's office has opened a broad investigation into Exxon's conduct. Specifically, this includes whether Exxon violated New York law by making false and misleading representations about its risk management practices, investment practices, and valuation practices. Further, Schneiderman's office also alleges that Exxon has engaged in a bad faith pattern of obstruction and document destruction in response to subpoenas. In March 2016, Schneiderman and the attorneys general of seventeen other states and territories announced that they had formed a coalition to pursue climate change litigation against big energy companies, including Exxon. To make matters worse, investors have already filed class actions alleging securities fraud and other violations of law in light of Exxon's conduct and its effect on Exxon's stock value.

Exxon's conduct also damages its reputation within the business community and in the capital markets. In addition to price, Exxon's current and potential investors consider a company's ability to act ethically and in accordance with proper reporting procedures. Investors are less likely to invest in organizations that are unable to adhere to such policies. Exxon's ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, Exxon stands to incur higher marginal costs of capital and debt due to the increases of perceived risks of investing in and lending money to Exxon.

## Stockholder Demand

Given the above, our client demands that the Board take all necessary steps to investigate, address, and promptly remedy the harm inflicted upon Exxon as a result of the misconduct described herein. In particular, our client demands that the Board investigate the circumstances surrounding Exxon's violations of any applicable laws, rules, and regulations. Accordingly, the Board must undertake an investigation of the wrongdoing detailed herein consisting of independent and disinterested directors with the assistance of independent outside legal counsel. This investigation should, among other things, be sufficient to determine: (1) which current or former Exxon employees, officers, and directors were responsible for wrongful conduct causing harm to the Company; and (2) determine the extent to which Exxon was damaged by the foregoing.

Following the investigation, our client demands that Exxon commence legal proceedings against each party identified as being responsible for the mismanagement and other related misconduct described above. The legal proceedings should bring claims for breaches of fiduciary duty, among other relevant and appropriate claims. The legal proceedings should also seek recovery of monies paid to the parties responsible because these parties were unjustly enriched by such compensation.

The Board must commence these legal proceedings as expeditiously as possible, keeping in mind the relevant statute of limitations periods. Because the concern that the proceedings cannot be initiated prior to the expiration of the relevant statute of limitations, the Board should secure tolling agreements from all potential defendants, which allow the Board to complete its investigation and pursue all appropriate legal remedies. Moreover, to the extent that relevant statute of limitations periods expire prior to the Board commencing legal proceedings or

obtaining tolling agreements, the Board must investigate and purse claims for breaches of fiduciary duties and/or legal malpractice against who allowed any statute of limitations period to expire.

Finally, the Board must take all necessary actions to reform and improve its corporate governance and internal procedures to comply with all applicable laws to protect Exxon from engaging in further misconduct. Any future resolutions to the Company's By-Laws or Articles of Incorporation should be put to a stockholder vote, and the following actions may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

2. a proposal to strengthen the Company's controls over Exxon's internal policies and procedures; and;

3. a provision to permit the stockholders of Exxon to nominate at least three independent candidates for election to the Board.

Should you have any questions or concerns about this matter, please do not hesitate to contact me.

Sincerely,

Gregory E. Del Gaizo

1189256